IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PIANO GALLERY MADISON, LLC,

                Plaintiff,

v.

CREATE MUSIC, LLC, BENJAMIN GARBER, and
DEBRA GALLA,

                Defendants.

CREATE MUSIC, LLC,

                Counterclaim-Plaintiff,

v.

PIANO GALLERY MADISON, LLC, and
GRANT BILLINGS,

                Counterclaim-Defendants.

OPINION & ORDER

17-cv-713-jdp

---

Plaintiff Piano Gallery Madison, LLC, (PGM) operated Billings Piano Gallery in Madison, Wisconsin, until 2014. Then PGM's managing member, Grant Billings, moved to Florida and sold the business to defendant Create Music, LLC (CM). PGM filed suit against CM, CM's managing member, Benjamin Garber, and one of the business's employees, Debra Galla. It alleges that they failed to perform as they were required to by the asset purchase agreement executed by the parties. Defendants answered, and CM asserted counterclaims against PGM and Billings. Dkt. 17.

Now PGM and Billings (whom the court will refer to collectively as PGM) move to dismiss several of CM's counterclaims under Federal Rule of Civil Procedure 12(b)(6). Dkt. 22.

The court will grant PGM's motion and dismiss all of CM's counterclaims except the seven breach-of-contract claims against PGM alone.

ALLEGATIONS OF FACT

The court draws the following facts from defendants' pleading, Dkt. 17, and accepts them as true for the purpose of deciding PGM's motion. *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court recounted PGM's allegations in its February 6, 2018 order on defendants' motion to dismiss, Dkt. 16, and it will not repeat them here. But it will summarize those of CM's material allegations that differ from PGM's version of the events.

In answering PGM's amended complaint, CM denies that it breached the terms of the asset purchase agreement, and it alleges that PGM failed to perform all of the conditions precedent to require CM's performance under the agreement.

CM also alleges that PGM breached eight provisions of the agreement. First, section 1.2 of the agreement defines "purchased assets," that is, those assets that PGM agreed to sell to CM. Dkt. 5-1, at 2. PGM allegedly retained several of those assets.

Second, section 1.2(f) defines the purchased assets to include the "limited right and license to use and do business under" PGM's service marks, and provides,

> In the event that [PGM] determine that one or more of [CM's] uses of the marks is inconsistent with [PGM's] quality standards, or that the quality of any of the good or services with which the marks are used is not consistent with maintaining the goodwill inherent in the marks, [PGM] shall so notify [CM], and [CM] shall cease all such disapproved use of the marks.

*Id.* at 3. PGM allegedly revoked CM's use of the marks not because of a quality issue but because of a monetary dispute between the parties.

Third, section 1.3(b) provides that the gross profits from the next sale of a Steinway D Concert Piano would be "immediately paid over to" PGM from CM's gross revenue of the sale. *Id.* at 4. The agreement specifies that the gross profit amount was to be determined by PGM and was "estimated to equal approximately $59,972." *Id.* CM alleges that PGM set the gross profit amount "based on an outdated price list," resulting in an "overcharge" of $2,171. Dkt. 17, ¶ 93(c).

Fourth, under section 2.1(e), CM was to assume "the fees and/or contract associated with hosting and maintaining the business website (www.billingspiano.com)." Dkt. 5-1, at 6. But PGM had already paid for a "multi-year agreement for hosting the website," and Garber "was not permitted to" assume control of the website. Dkt. 17, ¶ 93(d). Later, Billings took down the website.

Fifth, under section 2.2(f), PGM retained "any liabilities of [PGM] not explicitly included in section 2.1." Dkt. 5-1, at 6. CM alleges that it paid $1,155.59 in property taxes on PGM's behalf and that PGM is liable for that amount, as property taxes are not explicitly included in section 2.1.

Sixth, under section 4.2(c), PGM represented that "copies of the financial statements of [PGM] provided to [CM] present fairly, in all material respects, the financial position of" PGM. *Id.* at 9. CM alleges that other financial statements "suggest different numbers" and that therefore, PGM misrepresented its financial position. Dkt. 17, ¶ 93(f).

Seventh, section 9.2 provides that CM and PGM would each pay half of "all fees and expenses" related to "the execution, delivery and performance" of the agreement. Dkt. 5-1, at 15. CM alleges that PGM failed to pay half of CM's fees and "presented Create Music with its

3

own attorney's fees, which were both excessive and never contemplated by section 9.2." Dkt. 17, ¶ 93(g).

Eighth, CM and Billings executed a noncompetition agreement in connection with the asset purchase agreement. The noncompetition agreement provides that Billings would not "request or advise" any of PGM's customers "to withdraw, curtail or cancel any of its business or relations with [CM] or to engage in competition with [CM]." Dkt. 5-1, at 25. It recognizes several exceptions, including Billings's ability to "engage with customers associated with" the next Steinway sale and the completed sales defined as "excluded assets" in section 1.3 of the asset purchase agreement. *Id.* CM alleges that Billings breached the noncompetition agreement when he "sent dunning letters to past Billings Piano Gallery customers for bills that had in fact been paid." Dkt. 17, ¶ 86.

CM also claims that the actions constituting the first breach of contract amounted to conversion. And it claims that the actions constituting the second, fourth, and eighth breaches amounted to tortious interference with contracts.

ANALYSIS

PGM moves to dismiss all of CM's claims against Billings, and it moves to dismiss CM's claims of conversion and tortious interference in their entirety. To survive a motion to dismiss under Rule 12(b)(6), CM must allege facts sufficient to state a plausible claim for relief, that is, facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court is not bound to accept alleged legal conclusions. *Id.* at 827.

4

The court begins with the economic loss doctrine. PGM contends that CM's claims for tortious interference with contract are barred by the economic loss doctrine. As the court has previously explained, Wisconsin's economic loss doctrine prevents plaintiffs from claiming tort damages for purely economic losses when the underlying wrongful conduct is a breach of a contract between the parties. *See* Dkt. 16, at 4. CM's claims appear to be the prototype of those barred by the doctrine: its tortious interference claims are based on PGM's alleged breaches of the contract between the parties.

But the doctrine has several exceptions, and CM argues that one of those exceptions, for losses extraneous to the contract, applies here. Wisconsin courts have held that claims for fraudulent inducement are not barred by the economic loss doctrine when the inducement and loss are extraneous to the contract. *See Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp.*, 562 F. Supp. 2d 1009, 1016 (W.D. Wis. 2008). Judge Crabb has reasoned that Wisconsin courts would likely recognize a similar exception for claims of tortious interference: "it is likely that they would find that the economic loss doctrine bars claims for tortious interference with contracts unless the claims are 'extraneous' to the contractual relationship between the parties, that is, unless the actions underlying the claim were not breaches of the contract between the parties." *Id.*

Here, CM specifically alleges in its counterclaims that the actions underlying its tortious-interference claims were breaches of the asset purchase agreement. Therefore, the alleged tortious interference is not extraneous to the contract, and the economic loss doctrine applies. CM attempts to distance the alleged tortious interference from the asset purchase agreement, arguing that PGM's revocation of CM's license to the service marks was for a reason not authorized by the contract, that the PGM shut down the website ten months after the

5

agreement was executed and did so for "no business purpose," and that Billings's efforts to collect payment from PGM's customers were "well beyond the bargain for which the parties contracted." Dkt. 24, at 9–10. CM's arguments only underscore the true nature of its claims against PGM: it alleges that PGM took certain actions on matters contemplated by the contract but that those actions were not authorized by the contract. Thus, CM's remedy, if any, will be found in its breach-of-contract claims. The court will dismiss the tortious-interference claims as barred by the economic loss doctrine.

The parties don't address the application of the economic loss doctrine to CM's conversion claim, but this claim also appears to be a prototype of those barred by the doctrine. *Cf. Brainstorm Interactive, Inc. v. Sch. Specialty, Inc.*, No. 14-cv-50, 2014 WL 6893881, at *14–15 (W.D. Wis. Dec. 5, 2014) (dismissing a conversion claim as barred by the economic loss doctrine when the claim was based on "a risk the parties not only *could* have reasonably contemplated, but *did* contemplate in their" contracts); *Lansing v. Carroll*, No. 11-cv-4153, 2012 WL 4759241, at *3 (N.D. Ill. Oct. 5, 2012) (dismissing a conversion claim under Illinois's version of the economic loss doctrine where the success of the claim turned on the interpretation of the contract between the parties), *cited with approval in Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 826 (7th Cir. 2018). The conversion claim depends entirely on the asset purchase agreement: PGM only "took" CM's property if the agreement transferred ownership of the items to CM. CM can't prove its conversion claim without proving its breach-of-contract claim; the claims rise and fall together. Because the conversion claim is redundant to the breach-of-contract claim and because it is barred by the economic loss doctrine, the court will dismiss it.

That leaves the breach-of-contract claims. PGM moves to dismiss the eighth breach-of-contract claim in its entirety. This claim concerns Billings's efforts to collect payment from PGM's customers. According to CM, this violated the noncompetition agreement between Billings and CM. The relevant provision of the noncompetition agreement provides that Billings would not "directly or indirectly" "request or advise" any of PGM's customers "to withdraw, curtail or cancel any of its business or relations with [CM] or to engage in competition with [CM]." Dkt. 5-1, at 25. CM's theory is that by sending letters to PGM customers requesting payment of amounts already paid, Billing annoyed the customers, sewed confusion and distrust in CM, "undermined those customers' business relationships with" CM, and discouraged them from engaging in future business with CM. Dkt. 17, ¶¶ 86, 93(h).

CM focuses on whether Billings's efforts to collect payment were in good faith. But its claim fails for a more basic reason: the noncompetition agreement bars Billings from requesting or advising PGM's customers to stop doing business with CM, and there is no allegation that Billings did so. CM alleges that the only request Billings made was for payment—that is, he wasn't asking customers to stop doing business with CM, but rather he was asking them to make good on the business they had already done with PGM. Billings's letters may have had the effect, whether intended or unintended, of discouraging customers from doing business with CM in the future, but the noncompetition agreement didn't bar all communications with such an effect. Because Billings's alleged conduct did not violate the noncompetition agreement, the court will dismiss this claim.

PGM does not move to dismiss the remaining breach-of-contract claims, other than to point out that they cannot be brought against Billings individually. CM does not challenge that

7

assertion, so the court will dismiss the remaining breach-of-contract claims against Billings. CM may proceed on the first seven breach-of-contract claims against PGM alone.

ORDER

IT IS ORDERED that:

1. Counterclaim-defendants Piano Gallery Madison, LLC, and Grant Billings's motion to dismiss, Dkt. 22, is GRANTED.

2. Counterclaim-defendant Grant Billings is DISMISSED from the case.

Entered July 19, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge